# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CINDY LOU BROWN,                          )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )      1:20CV1035
                                          )
KILOLO KIJAKAZI,                          )
Acting Commissioner of Social             )
Security,                                 )
                                          )
                    Defendant.[1]         )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Cindy Lou Brown, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 10 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 13, 16; see also Docket Entry 14 (Plaintiff's Memorandum); Docket Entry 17 (Defendant's Memorandum); Docket Entry 19 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1]  President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I.  PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 144-52), alleging a disability onset date of October 9, 2009 (see Tr. 146).  Upon denial of that application initially (Tr. 46-55, 69-72) and on reconsideration (Tr. 56-68, 77-84), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 85-86).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 25-45.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 9-19.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 141-43), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1.  [Plaintiff] last met the insured status requirements of the . . . Act on September 30, 2014.
>
> 2.  [Plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of October 9, 2009 through her date last insured of September 30, 2014.
>
> . . .
>
> 3.  Through the date last insured, [Plaintiff] had the following medically determinable impairments: Back and Neck Pain, Arthritis of the Hands, Psoriasis, Depression, and Alleged Borderline Intellectual Functioning.
>
> 4.  Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore,

2

[Plaintiff] did not have a severe impairment or combination of impairments.

. . .

5. [Plaintiff] was not under a disability, as defined in the . . . Act, at any time from October 9, 2009, through September 30, 2014, the date last insured.

(Tr. 14-18 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402

3

U.S. 389, 401 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted).  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted).  "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to

4

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475

---

[2] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

5

n.2 (4th Cir. 1999).[3]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80.  However, if the claimant establishes an inability to

---

[3]  "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[4]  "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ erred by finding that Plaintiff's intellectual impairment did not constitute a severe impairment" (Docket Entry 14 at 4 (bold font and single-spacing omitted); see also Docket Entry 19 at 1-2);

2) "[t]he ALJ erred in finding that Plaintiff's cervical and lumbar [degenerative disc disease ('DDD')] did not constitute severe impairments" (Docket Entry 14 at 8 (bold font and single-spacing omitted)); and

---

[5]  A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

7

3) "[t]he structure of the SSA is constitutionally invalid" (id. at 13 (bold font omitted).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 17 at 5-24.)

## 1. Intellectual Disability

Plaintiff's first issue on review argues that "[t]he ALJ erred by finding that Plaintiff's intellectual impairment did not constitute a severe impairment." (Docket Entry 14 at 4 (bold font and single-spacing omitted); see also Docket Entry 19 at 1-2).) In particular, Plaintiff deems "not persuasive" the ALJ's three bases for finding Plaintiff's intellectual disability non-severe: 1) "she did not have treatment for her low intelligence in the relevant time period [] from 2009 to 2014," 2) she "had a good employment history as a sander and in housekeeping from 1975 through 2009," and 3) "her doctors [treating other conditions] did not note that she was intellectually impaired." (Docket Entry 14 at 4 (citing Tr. 17-18).) Plaintiff further points out that "[t]he threshold for qualifying as a severe impairment is quite low – she need only show that the impairment more than minimally interferes with her ability to work and . . . [Plaintiff] testified to trouble reading . . . and trouble with performing math." (Id. at 7 (referencing Tr. 39).) According to Plaintiff, "objective support for her testimony [exists] in the record," including "school records show[ing] poor performance in school, special education

8

classes, [and] that she did not go past the seventh grade and has an IQ in the [mild mental retardation] range at 67." (Id. (citing 171-74).)  In Plaintiff's view, "[s]uch evidence is the best for demonstrating a considerable lifelong intellectual impairment." (Id. (citing Leftwich v. Colvin, No. 1:13CV414, 2016 WL 126753, at *6 (M.D.N.C. Jan. 11, 2016), recommendation adopted, slip op. (M.D.N.C. Feb. 2, 2016) (Schroeder, J.), Holtsclaw v. Astrue, No. 1:10CV199, 2011 WL 6935499, at *4 (W.D.N.C. Dec. 30, 2011) (unpublished), and Dixon v. Astrue, No. 7:08CV218, 2009 WL 4545262, at *3 (E.D.N.C. Dec. 4, 2009)).)  Those contentions lack merit.

"At step 2 of the [SEP], [the ALJ] determine[s] whether an individual has a severe medically determinable physical or mental impairment or combination of impairments that has lasted or can be expected to last for a continuous period of at least 12 months or end in death."  Social Security Ruling 16-3p, Titles II & XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *11 (Oct. 25, 2017) ("SSR 16-3p").  An impairment fails to qualify as "severe" if it constitutes "only a slight abnormality . . . which would have no more than a minimal effect on an individual's ability . . . to perform basic work activities."  Social Security Ruling 85-28, Titles II and XVI: Medical Impairments that Are Not Severe, 1985 WL 56856, at *3 (1985) ("SSR 85-28").  Applicable regulations further identify mental "basic work activities" as including "[u]nderstanding, carrying out, and remembering simple

instructions," "[u]se of judgment," "[r]esponding appropriately to supervision, coworkers and usual work situations," and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b). Plaintiff bears the burden of proving severity at step two. Hunter, 993 F.2d at 35; see also Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007) ("Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." (internal citation omitted)).

The ALJ provided the following analysis supporting her step-two finding that Plaintiff's "Alleged Borderline Intellectual Functioning" rated as non-severe (Tr. 14 (bold font omitted)):

> [Plaintiff] testified at the hearing that she . . . had problems reading and writing, and her husband helped with grocery shopping and financial matters. [Plaintiff] stated that she completed only the 7th grade.
>
> After considering the evidence of record, the [ALJ] finds that [Plaintiff]'s medically determinable impairments could have reasonably been expected to produce a few of the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [we]re not entirely consistent for the reasons explained in th[e ALJ's] decision.
>
> . . .
>
> Because [Plaintiff] had medically determinable mental impairments, the [ALJ] has considered the four broad functional areas, set out in the disability regulations for evaluating mental disorders . . . .
>
> The first functional area is understanding, remembering or applying information. In this area, [Plaintiff] had mild limitation. The next functional area is interacting with others. In this area, [Plaintiff] had mild limitation. The third functional area is concentrating,

persisting or maintaining pace. In this area, [Plaintiff] had mild limitation. The fourth functional area is adapting or managing oneself. In this area, [Plaintiff] had mild limitation.

[Plaintiff]'s attorney cited psychological testing while [Plaintiff] was a child as evidence of an intellectual disability. [Plaintiff] underwent a Stanford-Binet test at age 7, and in 1966 was reported to have an IQ of only 67; and she was in special education from 1965 to 1975, from ages 7-17. However, there is no additional evidence in the record of a cognitive or intellectual disorder in any of the medical records from 2011 to 2019. [Plaintiff] had a good employment history of semi-skilled work from 1975 to 2009, over a 30-year time period; and the [ALJ] observed no significant evidence during the hearing of any limited mental functioning.

There is no significant evidence in the record through the end of 2014, or significantly thereafter, of any severe problems with attention and concentration, mental focus, cognitive adequacy, dealing with others or interacting with others in the work setting, no problems with social functioning, and no significant difficulties functioning independently and adapting to changed circumstances.

. . .

Because [Plaintiff]'s medically determinable mental impairments caused no more than "mild" limitation in any of the functional areas; and, the evidence does not otherwise indicate that there is more than minimal limitation in [Plaintiff]'s ability to do basic work activities, they were non-severe . . . .

(Tr. 16-18 (internal parenthetical citations and underscoring omitted).) For the reasons described more fully below, Plaintiff's challenges to the ALJ's rationale miss the mark.

Plaintiff first objects to the ALJ's "f[inding] that [Plaintiff's] low intelligence did not affect her ability to work because she did not have treatment for her low intelligence in the

11

relevant time period [] from 2009 to 2014" (Docket Entry 14 at 4
(citing Tr. 17-18)), because "there is no treatment for [mild
mental retardation/intellectual disability,]" and the
Commissioner's "'regulation expressly define[s] mental retardation
as denoting a lifelong condition'" (id. at 6 (quoting Luckey v.
U.S. Dep't of Health & Human Servs., 890 F.2d 666, 668 (4th Cir.
1999))).[6] Plaintiff's argument fails, because the ALJ offered her
observation that Plaintiff "[a]pparently . . . did not require any
type of mental health treatment by a psychiatrist, therapist, or
social worker" in the context of evaluating Plaintiff's "complaints
of depression" and not her alleged intellectual disability. (Tr.
18 (emphasis added).)

Plaintiff next contests the ALJ's reliance on Plaintiff's
"good employment history as a sander and in housekeeping from 1975
through 2009" to support the non-severity finding. (Docket Entry
14 at 4 (citing Tr. 17-18).) In that regard, Plaintiff notes that
"a severe impairment, by definition[,] does not keep someone from
working in and of itself" (id. at 5 (citing 20 C.F.R. § 404.1520)),
and that "individuals with an IQ of 55 through 70 . . . 'can
usually live successfully in their community, either independently
or in supervised settings'" (id. (quoting American Psychiatric

---

[6] The regulations in effect since the time Plaintiff filed her claim on January
30, 2017 (see Tr. 144-52), no longer define mental retardation as a lifelong
condition. See 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00B.4 (versions
effective since Jan. 17, 2017).

Ass'n, <u>Diagnostic & Statistical Manual of Mental Disorders</u> 43 (4th ed. rev. 2000))). Plaintiff additionally points out that "the regulations 'assume many, if not most, mildly mentally retarded individuals will be able to work[ and, t]herefore, the fact that a claimant has a history of continuous employment in the past is irrelevant to whether she has subsequently become disabled due to the development of additional severe impairments.'" (<u>Id.</u> (quoting <u>Shaw v. Astrue</u>, No. 4:08CV132, 2009 WL 2486932, at *7 (E.D.N.C. Aug. 13, 2009) (unpublished) (ellipses and some brackets omitted), and citing, <u>inter alia</u>, <u>Leftwich</u>, 2016 WL 126753, at *7).) According to Plaintiff, "[s]uch is the case here where [she] worked for many years in mentally undemanding manual labor jobs, but upon developing additional physical impairments from her cervical and lumbar DDD, was no longer able to persist." (<u>Id.</u> at 6 (citing Tr. 36-38).)

Plaintiff's argument glosses over a significant fact which distinguishes the instant case from <u>Leftwich</u> and <u>Shaw</u> – those cases both evaluated an ALJ's determination that the claimant's intellectual disability did not meet or equal the requirements of <u>Listing 12.05C</u>, <u>see</u> <u>Leftwich</u>, 2016 WL 126753, at *7; <u>Shaw</u>, 2009 WL 2486932, at *6-7, which Listing no longer existed at the time Plaintiff filed her claim on January 30, 2017 (<u>see</u> Tr. 144-52), <u>see</u> <u>Trotter v. Saul</u>, No. 2:20CV1760, 2022 WL 1129647, at *11 (N.D. Ala. Apr. 15, 2022) (unpublished) (noting that "Listing 12.05 changed on

January 17, 2017," that "[a]mended Listing 12.05 simplified the four sets of criteria[, i.e., subsections (A), (B), (C), and (D),] into two alternate criteria in subsections 12.05(A) and (B)," and that "the [SSA] stated the amended rules 'w[ould] apply . . . to new applications filed on or after the effective date of the rules'" (quoting <u>Dames v. Commissioner of Soc. Sec.,</u> 743 Fed. Appx. 370, 372 (11th Cir. 2018), in turn quoting "Revised Medical Criteria for Evaluating Mental Disorders," 81 Fed. Reg. 66,137, 66,138 (Sept. 26, 2016)).

Prior to that amendment, Listing 12.05C required "[a] valid verbal, performance, or full scale IQ of 60 through 70 <u>and a physical or other mental impairment imposing an additional and significant work-related limitation of function</u>." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05C (emphasis added) (version effective until Jan. 16, 2017). Thus, <u>in the setting of Listing 12.05C</u>, a claimant's development of an <u>additional</u> impairment imposing <u>significant</u> functional limitations rendered the claimant's prior work history less relevant to the determination of whether the claimant demonstrated the required adaptive deficits. <u>See</u> <u>Leftwich</u>, 2016 WL 126753, at *7; <u>Shaw</u>, 2009 WL 2486932, at *6-7; <u>see also</u> <u>Luckey</u>, 890 F.2d at 669 (holding that the Commissioner "may not rely upon previous work history to prove non-disability <u>where the [Listing] 12.05C criteria are met</u>" (emphasis added)).

14

Outside of the context of Listing 12.05C, courts have countenanced an ALJ's consideration of a claimant's work history in evaluating the claimant's intellectual disability. See, e.g., Walterman v. Colvin, No. 15CV3860, 2016 WL 8199313, at *6 (D. Minn. June 24, 2016) (unpublished) ("Most importantly, despite his borderline intellectual functioning, [the plaintiff] has a strong work history, maintaining one job as a laborer in a meat packing facility for ten years . . . . This fact supported the ALJ's conclusion that [the plaintiff]'s impairments d[id] not cause more than mild limitations in any of the relevant functional areas."); Frye v. Astrue, No. 1:12CV1533, 2014 WL 3509985, at *8 (M.D. Pa. July 15, 2014) (unpublished) (affirming ALJ's decision "that [the plaintiff]'s mental limitations were not a severe impairment," where "the ALJ explained that [the plaintiff]'s own work history, such as forklift operation, was inconsistent with a conclusion of mild mental retardation and incapability of competitive employment").

Plaintiff additionally faults the ALJ for observing that Plaintiff's "doctors [treating other conditions] did not note that she was intellectually impaired." (Docket Entry 14 at 4 (citing Tr. 17-18).) The ALJ here did state, as one part of his severity analysis that, beyond Plaintiff's school records, "no additional evidence [existed] in the record of a cognitive or intellectual disorder in any of the medical records from 2011 to 2019." (Tr.

17.)  The  lack  of  an  intellectual  disability  <u>diagnosis</u>  in
Plaintiff's  treatment  records  (standing  alone)  does  not  provide
much  support  for  the  ALJ's  non-severity  finding  because,  as
Plaintiff  argues,  "ALJs  cannot  cite  to  a  dearth  of  references  to
mental  issues  in  physical  treatment  records  in  support  of  arguing
that  an  individual  does  not  have  a  [severe]  mental  disorder
[because]  th[o]se  doctors  are  generally  not  looking  . . .  or
testing  [for  mental  impairments]"  (Docket  Entry  14  at  6  (citing
<u>Wilder v. Chater</u>,  64  F.3d  335,  337  (7th  Cir.  1995))).   The  ALJ,
however,  also  noted  that  the  medical  providers  treating  Plaintiff's
other  impairments  (including  <u>depression</u>)  did  not  record  any  "severe
problems  with  attention  and  concentration,  mental  focus,  cognitive
adequacy,  [or]  dealing  with  others"  (Tr.  18)  which,  at  least  to  the
extent  that  those  providers  treated  Plaintiff's  depression,  held
some  relevance  as  to  the  impact  of  her  alleged  intellectual
disability  on  her  ability  to  function  in  those  areas.   Furthermore,
as  explained  in  more  detail  below,  the  ALJ  here  also  relied  on
other,  more  probative  grounds  for  finding  Plaintiff's  alleged
intellectual  disability  non-severe.

In  addition  to  (properly)  considering  Plaintiff's  long
employment  history  in  semi-skilled  jobs,  the  ALJ  also  discounted
Plaintiff's  IQ  score  of  67  on  the  Stanford-Binet  Intelligence  Scale
administered  in  June  1966  when  Plaintiff  was  seven  years  old.   (Tr.
17  (referencing  Tr.  174).)   The  Commissioner's  internal  policies

16

make clear that, because "IQ scores stabilize after age 16 and are generally considered current after that time," IQ test scores obtained from age 7 to age 16 remain valid for only two years. Program Operations Manual System ("POMS") § DI 24583.055. Thus, Plaintiff's IQ score on the Stanford-Binet in June 1966 remained a valid indication of her intellectual functioning only through June 1968, and the ALJ did not err in discounting the score. Although Plaintiff notes that the POMS section in question also states that "'IQ scores that are not current may still provide useful information about whether a person's intellectual disorder began during the developmental period'" (Docket Entry 19 at 1 (quoting POMS § DI 24583.055)), the ALJ did not find that Plaintiff's 1966 IQ score merited <u>no weight</u> (<u>see</u> Tr. 17); rather, the ALJ acknowledged that score, but found other evidence of Plaintiff's functioning more probative of the non-severity of her intellectual impairment (<u>see</u> Tr. 17-18).

Moreover, the ALJ found the state agency psychological consultants' opinions that Plaintiff's mental impairments rated as non-severe (<u>see</u> Tr. 49-50, 62-63) "generally persuasive" as "consistent with the majority of the evidence of record" (Tr. 18). Significantly, the consultants noted as follows with regard to Plaintiff's 1966 IQ score:

> At age 7, [Plaintiff] produced a Stanford Binet IQ of 67 and was in special education from age 7 to 17. She left school early. <u>This IQ must have been an underestimate, considering [Plaintiff]'s work roles and normal exam</u>

17

> presentations [regarding psychiatric findings].
> [Plaintiff] worked cleaning offices 2014-2105 and as an
> inspector/packer in furniture manufacturing 1994-2009.
> She earned [substantial gainful activity] and filed a
> [DIB] claim based on her own past work. She may have had
> a slow start developmentally or may have had unrecognized
> [learning disability]. Educational misclassifications in
> the 1960s are not uncommon.

(Tr. 50 (emphasis added); see also Tr. 62-63.) The ALJ's crediting of those opinions provides further support for her non-severity finding regarding Plaintiff's alleged intellectual disability.

In light of the foregoing analysis, Plaintiff's first assignment of error falls short.[7]

## 2. Cervical and Lumbar DDD

Plaintiff's second assignment of error maintains that "[t]he ALJ erred in finding that Plaintiff's cervical and lumbar DDD did not constitute severe impairments." (Docket Entry 14 at 8 (bold font and single-spacing omitted).) In that regard, Plaintiff contends that, "where an individual complains of pain and other symptoms of a condition before the [date last insured ('DLI')] expires and testing later confirms an objective source for that pain, the ALJ needs to give retrospective consideration to that evidence." (Id. (citing Bird v. Commissioner of Soc. Sec. Admin., 699 F.3d 337, 340-41 (4th Cir. 2012), and Booker v. Berryhill, No.

---

[7] Consistent with that conclusion, Plaintiff did not claim any kind of intellectual disability as an impairment that limited her ability to work on her Disability Report. See Walterman, 2016 WL 8199313, at *7 (finding no error in ALJ's determination that the plaintiff's borderline intellectual functioning rated as non-severe, where the plaintiff's "cognitive impairments were not even listed in [his] current application for disability benefits").

18

3:16CV299, 2017 WL 2676497, at *6 (W.D.N.C. June 21, 2017) (unpublished)).) According to Plaintiff, "[w]hile the ALJ portray[ed consultative medical examiner] Dr. [George] Osei-Bonsu's 2012 evaluation as an outlier with no other evidence of considerable difficulties until [Plaintiff]'s lumbar surgery in 2019, the record is more nuanced with complaints predating the DLI in 2014 and continuing from 2015 onward." (Id. at 10; see also id. at 10-12 (detailing evidence Plaintiff believes reflects complaints of DDD-related symptoms before and after DLI (citing Tr. 252-54, 256-57, 259, 262, 266, 274-75, 284-92, 311, 324, 344, 456, 499, 652-53, 800, 802, 861-63, 894, 1188)).) In Plaintiff's view, "[i]t is not her fault, especially as a low IQ individual (who may not advocate for herself as strongly as others), that despite complaining to her doctors for many years of neck, arm, back and leg pain and numbness that her providers did not order MRIs to investigate the cause of these symptoms until 2018." (Id. at 12.) Plaintiff's arguments miss the mark.

In terms of a physical impairment, Plaintiff bears the burden at step two of producing evidence that such an impairment causes "more than a minimal effect on [her] ability . . . to perform [physical] basic work activities," SSR 85-28, 1985 WL 56856, at *3, which include "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, [and] handling," 20 C.F.R. § 404.1522(b)(1). In making that showing, "[m]edical evaluations

19

made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." Bird, 699 F.3d at 340. Indeed, Bird holds that "post-DLI medical evidence generally is admissible . . . in such instances in which that evidence permits an inference of linkage with the claimant's pre-DLI condition," id. at 341 (emphasis added) (citing Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969)), such as when medical evaluations post-dating a claimant's DLI "reflect[ed] . . . a possible earlier and progressive degeneration," Moore, 418 F.2d at 1226 (emphasis added). "By contrast, linkage is not present where the post-DLI evidence does not provide information regarding the claimant's pre-DLI functional limitations." David H. v. Saul, No. 4:20CV3, 2021 WL 1232674, at *10 (W.D. Va. Apr. 1, 2021) (unpublished) (emphasis added) (citing Parker v. Berryhill, 733 F. App'x 684, 687 (4th Cir. 2018)).

The ALJ provided the following analysis to support her finding that Plaintiff's "Back and Neck Pain" qualified as non-severe (Tr. 14 (bold font omitted)):

> In terms of [Plaintiff]'s physical impairments, the record does show complaints of back, neck, shoulder, and leg pain prior to the [DLI]. However, there does not appear to be any significant x-ray evidence in the record of degenerative disk or joint disease. The only evidence of any problems with gait or ambulation was during the consultative examination in 2012; but all other evidence prior to the end of 2014 did not show any significant difficulties with standing, walking, or with lifting or carrying objects.

20

> The [ALJ] concedes that [Plaintiff] did have some medical
> treatment for diagnosed impairments prior to September
> 30, 2014; but the overwhelming weight of the medical
> evidence shows that these impairments did not cause any
> significant limitations in standing, walking, or sitting,
> or with the use of the upper extremities for lifting and
> carrying objects.

(Tr. 17 (internal parenthetical citations omitted).) Plaintiff's attempt to invoke Bird as a basis for challenging the ALJ's step two finding that Plaintiff's "Back and Neck Pain" rated as non-severe (Tr. 14 (bold font omitted)) fails on two grounds.

First, unlike in Bird, where the claimant submitted no medical records pre-dating his DLI, see Bird, 699 F.3d at 339, the record here demonstrates that Plaintiff had consistent medical treatment from April 9, 2013, through her DLI of September 30, 2014, for a variety of medical conditions, including hypertension (see Tr. 277-78, 280-81, 283-84, 286-87, 289), depression (see Tr. 274-75, 277-78, 280-81, 283-84), arthritis in her hands (see Tr. 274-75, 283), abdominal cellulitis (see Tr. 277-78), dizziness (see Tr. 280, 283, 286, 288, 290-91), inner ear pain (see Tr. 290-91), and psoriasis (see Tr. 278). Significantly, in none of those treatment visits did Plaintiff complain of (or receive treatment for) neck or back pain (see Tr. 274-91) and, on April 9, 2013, the provider noted full range of motion in Plaintiff's neck, normal tone and strength, normal sensation, and intact deep tendon reflexes (see Tr. 291).

Plaintiff's consultative examination with Dr. Osei-Bonsu on May 24, 2012, ordered in the context of her 2012 application for

21

DIB (see Tr. 47, 57), also would not have compelled the ALJ to find Plaintiff's back and neck impairments severe prior to the DLI. (See Tr. 828-31.)  At that examination, Plaintiff "state[d that] the main symptoms affecting functionality [we]re 'neck pain that radiat[ed] to [the] left arm and low back pain that [went] into [her] left leg[.']"  (Tr. 828 (parentheses omitted).)  Dr. Osei-Bonsu noted spinous and paraspinal tenderness in Plaintiff's cervical and lumbar spines (see Tr. 829-30) with an antalgic gait (see Tr. 830) and reduced range of motion (see Tr. 831), but recorded no spasm (see Tr. 829-30), a negative straight leg raise test (see Tr. 830), 4-5/5 muscle strength (see id.), and only "slightly weak" grip strength (id.).  Although Plaintiff appeared "unsteady" standing on her heels and performing a tandem walk, as well as "exhibited mild difficulty getting up from [a] sitting to [a] standing position," Dr. Osei-Bonsu noted that Plaintiff could "raise [her] arms overhead" and did not need a handheld assistive device, diagnosed only "[l]ow back pain" and "[c]ervicalgia," and opined that Plaintiff could "sit, stand, and walk on levelled [sic] terrain in [the] exam room without support."  (Id.)  Furthermore, as the ALJ's discussion of the evidence makes clear, no medical records exist from 2009 and 2010 (see Tr. 15-16), and the closest medical treatment Plaintiff received prior to the consultative examination was "an emergency room visit . . . for urinary blood" on March 24, 2011 (Tr. 15 (citing Tr. 817)).  Moreover, the next

22

treatment of record after the consultative examination took place nearly a year later, when Plaintiff sought care at Cornerstone Health Care for <u>dizziness and inner ear pain</u> on April 9, 2013 (<u>see</u> Tr. 290-91), and thereafter followed-up for management of her "<u>hypertension and depression</u>" (Tr. 16 (emphasis added) (citing Tr. 271, 272-73, 280-81)) where examinations remained "essentially <u>normal</u> in all body systems" (<u>id.</u> (emphasis added)).

Under such circumstances, the ALJ had a sufficient pre-DLI record on which to base her non-severity finding, which renders <u>Bird</u> inapplicable. <u>See</u> <u>David H.</u>, 2021 WL 1232674, at *11 (finding no error under <u>Bird</u> where "pre-DLI evidence fail[ed] to reflect any significant functional limitations caused by the [plaintiff's rheumatoid arthritis]" and "repeatedly not[ed] normal exam findings and occasional symptoms that resolved with treatment"); <u>Tolbert v. Colvin</u>, No. 1:15CV437, 2016 WL 6956629, at *4 (M.D.N.C. Nov. 28, 2016) (unpublished) (Osteen, C.J.) ("<u>Bird</u> has [] repeatedly been found inapplicable where there was meaningful evidence of the claimant's disability or lack of disability during the DIB coverage period." (internal quotation marks omitted)); <u>Graham v. Colvin</u>, No. 5:12CV174, 2015 WL 114277, at *5 (W.D.N.C. Jan. 8, 2015) (unpublished) (noting that case did not involve "complete lack of a [pre-DLI] medical record as present in *Bird*," that "medical record establishe[d] that [the plaintiff] regularly went to the doctor for treatment," and that "[t]he completeness of her medical

23

record demonstrate[d] that she did not complain of tremors until after her DLI because that was when they had manifested or progressed to a degree where they would have interfered with her ability to work"); Haila v. Colvin, No. 5:13CV377, 2014 WL 2475749, at *15 (N.D. Fla. June 3, 2014) (unpublished) ("Unlike the facts in Bird, there was sufficient medical evidence prior to the [DLI] for the ALJ to determine whether [the p]laintiff was disabled and the evidence after her [DLI] did not establish she was disabled prior to this date.").[8]

Second, unlike in Bird, the post-DLI evidence here "does not provide information regarding the claimant's pre-DLI functional limitations," and thus fails to provide the required "linkage" to Plaintiff's pre-DLI condition, David H., 2021 WL 1232674, at *10. In Bird, the court found linkage of the plaintiff's "final condition . . . with his earlier symptoms," id. at 341, because the post-DLI records "summarized evidence that [the plaintiff] suffered from severe symptoms of PTSD before . . . his DLI," id., "indicated

---

[8] Plaintiff's suggestion that the lack of MRI evidence prior to the DLI resulted from her "low IQ" and inability to "advocate for herself as strongly as others" fails as wholly speculative. (See Docket Entry 14 at 12.) As discussed above, Plaintiff worked in semi-skilled jobs for over 20 years (see Tr. 42, 191), pursued regular medical care and obtained diagnostic imaging when warranted (see Tr. 274-91, 807-26), and filed two separate applications for DIB (see Tr. 47, 57), pursuing the instant claim to the fifth level of review in this Court. Those facts undermine Plaintiff's implication that her "low IQ" prevented her from obtaining MRIs of her cervical and lumbar spine prior to the DLI. Furthermore, as the discussion of the pre-DLI evidence above makes clear, Plaintiff did not, prior to the DLI, "complain[] to her doctors for many years of neck, arm, back and leg pain and numbness" (Docket Entry 14 at 12), and the absence of such complaints more plausibly explains why providers did not order spinal MRIs prior to Plaintiff's DLI.

that [his] symptoms of PTSD had been ongoing since his [pre-DLI] return from military service," id., and explained the impact of the plaintiff's PTSD on his ability to maintain employment and social relationships prior to the DLI, see id. at 342.

In contrast, none of the post-DLI evidence relied on by Plaintiff "provide[s] information regarding [her] pre-DLI functional limitations," David H., 2021 WL 1232674, at *10. (See Docket Entry 14 at 10-12 (citing Tr. 252-54, 256-57, 259, 262, 266, 274-75, 284-92, 311, 324, 344, 456, 499, 652-53, 800, 802, 861-63, 894, 1188).) Some of that evidence does not reflect treatment for neck, arm, back, or leg pain at all (see Tr. 254, 262, 266, & 311 (treatment for bradycardia and dizziness)), and other evidence attributes Plaintiff's complaints to causes other than spinal degeneration (see Tr. 252-53 (treatment on 7/21/15 for "back pain and painful breathing" after a fall), 256-57 (Plaintiff's primary care physician's 4/24/15 opinion that Plaintiff's leg pain represented "claudication" caused by "peripheral artery disease" warranting prescription of blood thinner Pletal as well as Meloxicam for hip and knee joint pain (emphasis added))), and/or reflects the recent onset of symptoms rather than an ongoing, chronic condition (see Tr. 256-57 (complaints on 4/24/15 of "bilateral hip pain that radiate[d] down to her legs[ that ] started about one month [prior]"), 259 (reports on 4/15/15 of "leg

25

weakness since th[at] morning" and "pain in hips and legs [for] 2 months" (emphasis added)).

The remainder of that evidence does reflect Plaintiff's complaints of neck, arm, back, or leg symptoms, but does not provide <u>any</u> information about her functional limitations <u>prior to the DLI</u>. (<u>See</u> Tr. 324 (9/29/16 reports of "tingling in both hands and legs" and joint pain in left elbow and right hip but reflecting <u>negative</u> straight leg raise test, <u>intact</u> pulses, and <u>normal</u> range of motion), 344 (6/5/17 office note documenting complaint of pain and numbness in buttocks, hips, and legs), 455-56 (10/23/18 MRI of lumbar spine showing multilevel disc bulges, facet arthropathy, spinal stenosis, foraminal stenosis, and disc protrusion with mass effect on right S1 nerve root), 499 (12/12-12/13/18 record of Plaintiff's anterior cervical discectomy), 652-53 (4/4-4/5/19 record of Plaintiff's lumbar fusion surgery), 800 (12/11/17 reports of pain in right hip and leg and numbness and tingling in both legs), 802 (4/16/18 complaints of pain and numbness in both legs from hips to ankles), 861-63 (11/15/18 report of "bilateral neck and arm pain, numbness, and weakness for [greater than] six months getting worse" and buttock pain for "<u>over 12 months</u>" with normal strength but decreased sensation and positive Hoffmann's sign (emphasis added)), 893-94 (11/15/18 cervical spine MRI reflecting "multilevel degenerative changes . . . worst at C4-C5 and C5-C6 where there is moderate central spinal canal stenosis" as well as

severe neuroforaminal stenosis and uncovertebral hypertrophy at C5-C6), 1188 (3/8/19 report of successful post-operative recovery from cervical surgery but ongoing complaints of back and leg pain warranting lumbar fusion)).)

In light of the lack of linkage between that post-DLI evidence and Plaintiff's pre-DLI condition, the ALJ did not err under <u>Bird</u> by declining to find Plaintiff's cervical and lumbar DDD severe impairments based on the post-DLI evidence. <u>See</u> <u>Armstrong v. Colvin</u>, No. 1:14CV346, 2015 WL 6738723, at *6 (M.D.N.C. Nov. 4, 2015) (unpublished) ("[A]lthough [the p]laintiff complained of pain in both knees and a[n ] orthopedist diagnosed mild degenerative joint disease in both of [the p]laintiff's knees [one year] prior to his [DLI], the orthopedist noted full range of motion in both knees and no effusion, and recommended no surgery and only medication management for any resultant symptoms[, and ] the record lacks any evidence that [the p]laintiff suffered from a meniscal tear in his left knee until the [] MRI [two years after his DLI]. Because nothing in the record links [the p]laintiff's meniscal tear [] to a pre-[DLI] left knee impairment, the ALJ did not err [under <u>Bird</u>].")., <u>recommendation adopted</u>, slip op. (M.D.N.C. Dec. 4, 2015) (Tilley, S.J.); <u>Graham</u>, 2015 WL 114277, at *4 (finding ALJ did not err by refusing retrospective consideration of post-DLI evidence of the plaintiff's tremors, where the plaintiff "did not complain of tremors until after her DLI, the record contained "no meaningful

corroboration [that the tremors existed pre-DLI] aside from her own statement that she quit work . . . due in part to her tremors," and "[n]one of [her] physicians offered a retrospective diagnosis or opined that her tremors existed prior to her DLI"); Greifenstein v. Colvin, No. 2:13CV81, 2014 WL 198720, at *4 (E.D. Va. Jan. 15, 2014) (unpublished) (noting that "pre-DLI evidence weigh[ed] against a finding of linkage [to the plaintiff's post-DLI condition,]" where "the [p]laintiff's treating physician during th[e pre-DLI] period . . . repeatedly documented less than severe symptoms").

In sum, Plaintiff's second assignment of error falls short.

### 3. Constitutionality of SSA

In Plaintiff's third and final assignment of error, she contends that "[t]he structure of the SSA is constitutionally invalid." (Docket Entry 14 at 13 (bold font omitted).) Specifically, Plaintiff asserts that "[t]he United States Supreme Court has held that it is unconstitutional for an executive agency to be led by a single individual who serves for a longer term than the President and can only be removed from his position for cause." (Id. (citing Seila Law LLC v. Consumer Fin. Prot. Bureau, 591 U.S. ___, ___, 140 S. Ct. 2183, 2197 (2020)).) According to Plaintiff, the "constitutionally invalid structure of the [Consumer Financial Protection Bureau ('CFPB')] is identical to that of the SSA," in that "[t]he Commissioner of SSA is the singular head of the [SSA],

28

serves for a six-year term, and cannot be removed by the President except for cause ('neglect of duty or malfeasance in office')." (Id. (quoting 42 U.S.C. § 902(a)(3)).) Plaintiff further maintains that "[t]he ALJ's delegation of authority in this case came from [then-Commissioner] Andrew Saul and is therefore constitutionally defective" (id. (citing Hearings, Appeals, and Litigation Law Manual (HALLEX) § I-2-0-2(A))), as well as that "the ALJ decided this case under regulations promulgated by [then-Commissioner] Saul when [he] had no constitutional authority to issue those rules" (id.). In Plaintiff's view, "the ALJ's decision must [] be vacated because he did not have the authority to hear or decide the case given the delegation of authority from [then-]Commissioner [Saul] who had no constitutional authority to head the [SSA]." (Id.) Those arguments ultimately fail as a matter of law.

As an initial matter, the Commissioner concedes "that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." (Docket Entry 17 at 7 (citing U.S. Dep't of Justice ("DOJ"), Office of Legal Counsel, "Constitutionality of the Commissioner of Social Security's Tenure Protection," 2021 WL 2981542 (July 8, 2021) ("2021 OLC Op")).) However, the Commissioner notes that, "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction

29

actually caused her harm." (Id. (citing Collins v. Yellen, ___
U.S. ___, ___ - ___, 141 S. Ct. 1761, 1787-89 (2021)).) According
to the Commissioner, Plaintiff's separation of powers argument
fails because 1) "the ALJ who issued the final decision denying
Plaintiff's claims was not appointed by a Commissioner subject to
Section 902(a)(3)'s removal restriction[, but r]ather, the ALJ had
her appointment ratified by an *Acting* Commissioner of Social
Security – whom the President could have removed from that role at
will, at any time", and 2) Plaintiff cannot "show that Section
902(a)(3)'s removal restriction caused the denial of her benefits
claim." (Id. at 8 (emphasis supplied by Commissioner).) For the
reasons that follow, the Commissioner's argument has merit.

a.   Acting Commissioner Removable at Will

    The Acting Commissioner offers the following argument
regarding the President's power to remove an Acting Commissioner of
the SSA at will:

> The ALJ who adjudicated Plaintiff's claim on December 26,
> 2019 held office under an appointment legally ratified in
> July 2018 by then-Acting Commissioner [Nancy] Berryhill.
> For her part, Ms. Berryhill had been designated to serve
> as Acting Commissioner in April 2018, upon former
> President Trump's nomination of Andrew Saul to serve as
> Commissioner.[FN*]  In her Acting capacity, she enjoyed no
> statutory tenure protection.  See 42 U.S.C. § 902(b)(4);
> Collins, 141 S. Ct. at 1783 ("[W]e generally presume that
> the President holds the power to remove at will executive
> officers and that a statute must contain plain language
> to take [that power] away."); see also United States v.
> Eaton, 169 U.S. 331, 343 (1898) (holding that where a
> "subordinate officer is charged with the performance of
> the duty of the superior for a limited time, and under
> special and temporary conditions, he is not thereby

30

transformed into the superior and permanent official"); accord Collins, 141 S. Ct. at 1782 (FHFA Acting Director removable at will because relevant "subsection does not include any removal restriction. Nor does it cross-reference the earlier restriction on the removal of a confirmed Director.").[FN**] Thus, Ms. Berryhill was removable at will, and her ratification of the deciding ALJ's appointment accordingly severed any conceivable nexus between Section 902(a)(3)'s tenure protection for a confirmed Commissioner and any alleged harm to Plaintiff.

[FN*] Under the Federal Vacancies Reform Act (FVRA), 5 U.S.C. § 3346(a)(1), even if Ms. Berryhill's initial eligibility to serve as Acting Commissioner previously expired, then-President Trump nominated Andrew Saul for Commissioner in April 2018, such that Ms. Berryhill once again was eligible to serve as Acting Commissioner. The FVRA "incorporates a spring-back provision, which permits the acting officer to begin performing the functions and duties of the vacant office again upon the submission[] of a nomination, even if the 210-day period expired before that nomination was submitted." 23 O.L.C 60, 68 (1999), 1999 WL 1262050, at *8. That provision establishes a new period of acting service following a first or second nomination for the office. See 5 U.S.C. § 3346(a)(2), (b). Ms. Berryhill's eligibility following Mr. Saul's nomination was, therefore, valid — and it remained in force on July 16, 2018, the date [Acting Commissioner] Berryhill ratified the appointments of the [SSA's] ALJs, including the ALJ who later adjudicated Plaintiff's claim. See Social Security Ruling [] 19-1p[, Titles II and XVI: Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) on Cases Pending at the Appeals Council, 2019 WL 1324866 (Mar. 15, 2019)].

[FN**] The [] Act describes the "Commissioner of Social Security" as an individual "appointed by the President" and confirmed by the Senate. 42 U.S.C. § 902(a). The Commissioner is appointed to a term of six years, and "[a]n individual serving in the office of Commissioner may be removed from office" only for cause. 42 U.S.C. §902(a)(3). In a separate subsection, the statute addresses the "Deputy Commissioner of Social Security," who enjoys no removal protection, and is deemed the "Acting Commissioner" during the "absence or disability of the Commissioner . . . unless the President designates another officer of the Government as Acting

31

Commissioner." 42 U.S.C. § 902(b)(2), (4)[; c]ompare, 42
U.S.C. § 902(c)(1) (providing that the Chief Actuary is
removable only for cause).  In the absence of plain
statutory text providing tenure to an Acting Commissioner
— which would be "a singular anomaly in all of
administrative law," Rop v. Fed. Hous. Fin. Agency, 485
F. Supp. 3d 900, 938 (W.D. Mich. 2020) — a person serving
temporarily in an Acting capacity is removable at will.
See Collins, 141 S. Ct. at 1783 ("[W]e generally presume
that the President holds the power to remove at will
executive officers and that a statute must contain 'plain
language to take [that power] away.'"); accord Swan v.
Clinton, 100 F.3d 973, 987 (D.C. Cir. 1996) (holding
removal protection did not apply to "holdover" officials
since "if the President cannot remove holdover officials
. . . then holdover members could conceivably remain in
office for substantial, indeed unlimited, periods of
time").

(Docket Entry 17 at 9-11 (stray quotation mark and italics
omitted).)[9]

The statutory language of Section 902 supports the
Commissioner's position for three reasons.  To begin, comparison of
the language in the portion of Section 902 authorizing the
Commissioner with the portion authorizing the Deputy Commissioner
(who serves as Acting Commissioner in the Commissioner's absence,
disability, or vacancy) supports the Acting Commissioner's position
that the President can remove an Acting Commissioner at will.  The
applicable portion of that statute provides as follows:

(a) Commissioner of Social Security

(1) There shall be . . . a Commissioner of Social
Security . . . who shall be appointed by the President,
by and with the advice and consent of the Senate.

---

[9] Plaintiff did not address those arguments by the Commissioner in her Reply.
(See Docket Entry 19.)

. . .

(3) The Commissioner shall be appointed for a term of 6 years . . . . <u>An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office</u>.

. . .

(b) Deputy Commissioner of Social Security

(1) There shall be . . . a Deputy Commissioner of Social Security . . . who shall be appointed by the President, by and with the advice and consent of the Senate.

(2) The Deputy Commissioner shall be appointed for a term of 6 years . . . . In any case in which a successor does not take office at the end of a Deputy Commissioner's term of office, such Deputy Commissioner may continue in office until the entry upon office of such a successor. A Deputy Commissioner appointed to a term of office after the commencement of such term may serve under such appointment only for the remainder of such term.

. . .

(4) The Deputy Commissioner shall perform such duties and exercise such powers as the Commissioner shall from time to time assign or delegate. <u>The Deputy Commissioner shall be Acting Commissioner of the Administration during the absence or disability of the Commissioner and, unless the President designates another officer of the Government as Acting Commissioner, in the event of a vacancy in the office of the Commissioner</u>.

42 U.S.C. § 902 (emphasis added). Thus, although the portion of Section 902 governing the Commissioner includes an express removal for cause provision, <u>see</u> 42 U.S.C. § 902(a)(3), the corresponding provision in the portion of Section 902 involving the Deputy Commissioner lacks any such language, <u>see</u> 42 U.S.C. § 902(b)(2). Notably, the Supreme Court has cautioned that a statute must

33

expressly place limits on the President's authority to remove executive agency heads at will. See Collins, ___ U.S. at ___, 141 S. Ct. at 1783 ("[W]e generally presume that the President holds the power to remove at will executive officers and that a statute must contain plain language to take [that power] away." (internal quotation marks omitted)).

Second, the removal provision explicitly applies only to "[a]n individual serving in the office of Commissioner," 42 U.S.C. 902(a)(3) (emphasis added). Thus, by its very terms, Section 902(a)(3)'s removal provision does not apply to an individual serving in the office of the Acting Commissioner.

Third, Section 902(b)(4) expressly accords the President the power to "designate[] another officer of the Government as Acting Commissioner" other than the Deputy Commissioner in the event of a vacancy in the office of Commissioner. 42 U.S.C. § 902(b)(4) (emphasis added). That broad authority to designate any other "officer of the Government" as Acting Commissioner during a vacancy further supports the view that the removal restriction applicable to the office of Commissioner does not apply in the same manner to the office of Acting Commissioner.

Moreover, cases addressing the merits of Seila Law/Collins claims have found that Section 902(a)(3) does not limit the authority of the President to remove an Acting Commissioner, and that then-Acting Commissioner Berryhill's appointment of the

34

deciding ALJ precluded any possible link between Section 902(a)(3)'s unconstitutional removal provision and any alleged harm to the plaintiff. See, e.g., Standifird v. Kijakazi, No. 20CV1630, 2021 WL 5634177, at *4 (S.D. Cal. Dec. 1, 2021) (unpublished) ("Because an Acting Commissioner does not have the same removal restriction as the Commissioner and because [the] ALJ [] was properly appointed, [the p]laintiff's argument is not persuasive . . . ."), recommendation adopted, 2022 WL 970741 (S.D. Cal. Mar. 31, 2022) (unpublished); Alice T. v. Kijakazi, No. 8:21CV14, 2021 WL 5302141, at *18 (D. Neb. Nov. 15, 2021) (unpublished) ("[T]he ALJ's decision in this case was issued on July 17, 2019, one month after [then-Commissioner Andrew] Saul took office. The ALJ who decided [the p]laintiff's case was appointed by then-Acting Commissioner [Nancy] Berryhill, who could be removed from that office at the President's discretion."); Lisa Y. v. Commissioner of Soc. Sec., ____ F. Supp. 3d ____, ____, Civ. No. C21-5207, 2021 WL 5177363, at *5 n.1 (W.D. Wash. Nov. 8, 2021) ("[The Commissioner] correctly contends [that Nancy] Berryhill, as Acting Commissioner, was properly appointed and not subject to § 902's removal clause."); Boger v. Kijakazi, No. 1:20CV331, 2021 WL 5023141, at *3 (W.D.N.C. Oct. 28, 2021) (unpublished) ("Indeed, [the p]laintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the] ALJ [in question] was appointed by an Acting Commissioner of Social Security who could be

35

removed from that office at the President's discretion." (citing 42 U.S.C. § 902(b)(4), <u>Collins</u>, ___ U.S. at ___, 141 S. Ct. at 1783, and <u>Eaton</u>, 169 U.S. at 343)); <u>see also</u> <u>Fish v. Kijakazi</u>, No. 5:21cv182, 2022 WL 1504887, at *6 (N.D.W. Va. Apr. 26, 2022) (unpublished) ("Courts across the country have uniformly concluded that the allegedly unconstitutional nature of 42 U.S.C. § 902(a)(3) does not require remand." (citing cases)), <u>recommendation adopted</u>, 2022 WL 1498115 (N.D.W. Va. May 11, 2022) (unpublished).

Thus, because then-Acting Commissioner Nancy Berryhill appointed the ALJ who issued the decision denying Plaintiff's claims, and the President may remove Acting Commissioners at will, Plaintiff's challenge under <u>Seila Law/Collins</u> fails.

b.  <u>Impact on ALJ's Decision</u>

Next, the Commissioner maintains that, even if Acting Commissioners remained subject to Section 903(a)(3)'s removal for cause provision, Plaintiff's <u>Seila Law/Collins</u> argument would still fall short, because she did not demonstrate any actual harm arising from Section 902(a)(3)'s unconstitutional removal provision. (<u>See</u> Docket Entry 17 at 12.)  In that regard, the Acting Commissioner asserts that:

> [U]nlike Appointments Clause defects, where the presiding official does not enjoy proper authority to occupy the office, <u>see</u> <u>Lucia v. SEC</u>, 138 S. Ct. 2044 (2018), agency action is not *per se* invalid simply because it can be traced back to an official subject to an unconstitutional *removal* protection.  Rather, under <u>Collins</u>, where an agency official is properly appointed, there can be no claim that she "exercise[d] . . . power that [she] did

36

not lawfully possess." Collins, 141 S. Ct. at 1788; see also id. at 1788 n.23 ("the unlawfulness of [a] removal provision does not strip [an official] of the power to undertake the other responsibilities of his office"). Thus, "there is no reason to regard *any* of the actions taken" by officials with tenure protection during this period "as void." Id. at 1787 (emphasis added); see also id. at 1793 (Thomas, J., concurring) (explaining that where officials were properly appointed, there is "no barrier to them exercising power").

Collins teaches, therefore, that actions taken by properly appointed officials are not void. Regardless of the restrictions on removal, the properly appointed Commissioner had full authority to carry out the responsibilities of his office, including promulgating regulations and delegating authority under the [] Act. . . .

[R]elief is available in removal challenges only where the alleged injuries are caused by officials subject to the challenged removal restrictions, *and* where those restrictions themselves "inflicted compensable harm" upon plaintiffs. [Id.] at 1789. . . . To obtain a rehearing on separation of powers grounds, in other words, Plaintiff must show that Section 902(a)(3)'s removal restriction somehow caused the denial of her benefits claim.

(Docket Entry 17 at 13-14 (stray space and some internal bracketed material omitted).)[10]

Unlike Appointments Clause cases, where courts have found the very authority under which a government official has acted unconstitutional, see, e.g., Carr, ___ U.S. at ___, 141 S. Ct. at 1356-62; Probst, 980 F.3d at 1023, the unconstitutional removal provision at issue here did not impact then-Commissioner Saul's

_____

[10] Plaintiff did not address those contentions by the Commissioner in her Reply. (See Docket Entry 19.)

ability to carry out the duties of his office.  As another court
recently explained:

> [The p]laintiff's argument is similar to arguments the
> plaintiffs raised and the [United States Supreme] Court
> rejected in <u>Seila Law</u> and <u>Collins</u>.  First, like the
> plaintiffs in <u>Seila Law</u>, [the [p]laintiff here argues
> § 902(a)(3)'s removal provision automatically renders all
> agency action unconstitutional.  The [Supreme] Court in
> <u>Seila Law</u> rejected such an argument[,] observing one
> section of a statute may violate the Constitution without
> rendering the entire act void.  <u>Seila Law</u>, 140 S. Ct. at
> 2209.  The [Supreme] Court stated the removal limitation
> of the CFPB Director is the only defect and removal of
> the defect removes the constitutional violation.  The
> [Supreme] Court concluded the removal limitation was
> severable because the CFPB is capable of functioning
> independently of the infirm removal clause.  <u>Id.</u> [] ("The
> provisions of the Dodd-Frank Act bearing on the CFPB's
> structure and duties remain fully operative without the
> offending tenure restriction.  Those provisions are
> capable of functioning independently, and there is
> nothing in the text or history of the Dodd-Frank Act that
> demonstrates Congress would have preferred no CFPB to a
> CFPB supervised by the President."); <u>see also</u> [<u>id.</u>] at
> 2245.
>
> . . .
>
> The Supreme Court in <u>Collins</u> also rejected the argument
> an invalid removal provision rendered the FHFA's actions
> void from the outset.  The Supreme Court stated there was
> "no reason to hold that the third amendment [to the
> agreement between the FHFA and the Department of
> Treasury] must be completely undone."  <u>Collins</u>, [141 S.
> Ct.] at 1788.  The <u>Collins</u> Court further stated
> "[a]lthough the statute unconstitutionally limited the
> President's authority to remove the confirmed Directors,
> there was no constitutional defect in the statutorily
> prescribed method of appointment to that office.  As a
> result, there is no reason to regard any of the actions
> taken by the FHFA [challenged on appeal] as void."  [<u>Id.</u>]
> at 1787.  Accordingly, the argument the SSA's actions
> here are either void *ab initio* or became void at some
> later point due to § 902(a)(3)'s removal clause is not
> supported by either <u>Seila Law</u> or <u>Collins</u>.

Lisa Y., ___ F. Supp. 3d at ___, 2021 WL 5177363, at *6-7 (internal footnote, citation, and stray parenthesis and period omitted); see also Robinson v. Kijakazi, No. 1:20CV358, 2021 WL 4998397, at *3 (W.D.N.C. Oct. 27, 2021) (unpublished) ([The p]laintiff . . . offers no evidence to show that there is a nexus between the unconstitutional removal restriction and the denial of his application for disability benefits[ and ] simply argues that all actions taken by the Commissioner are void due to the unconstitutional removal provision. However, Collins expressly rejects this view." (internal citation omitted)), appeal filed, No. 21-2258 (4th Cir. Nov. 9, 2021).

Some decisions have allowed claims of the sort raised here to proceed in the face of standing challenges. See Dixie C. v. Kijakazi, No. 3:21CV764, 2021 WL 4822838, at *6 (N.D. Tex. Sept. 20, 2021) (unpublished) ("[B]ecause [the p]laintiff has established both traceability and redressability for the purposes of standing, the [c]ourt has standing to hear [the p]laintiff's constitutional claim." (emphasis added)), recommendation adopted, 2021 WL 4820764 (N.D. Tex. Oct. 15, 2021) (unpublished); Sylvia A. v. Kijakazi, No. 5:21cv76, 2021 WL 4692293, at *4 (N.D. Tex. Sept. 13, 2021) (unpublished) ("The [c]ourt finds that [the p]laintiff's separation-of-powers claim is both traceable and redressable such that she has standing to pursue it. Thus, all of [the p]laintiff's claims should proceed to briefing on the merits." (emphasis

added)), <u>recommendation adopted</u>, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021) (unpublished); <u>Albert v. Kijakazi</u>, No. 1:21CV4, 2021 WL 3424268, at *5 (D. Alaska Aug. 5, 2021) (unpublished) ("Because [the] plaintiff has <u>standing</u> to bring his constitutional claim, [the Commissioner]'s motion to dismiss is denied." (emphasis added)); <u>Tafoya v. Kijakazi</u>, 551 F. Supp. 3d 1054, 1059 (D. Colo. 2021) ("While ultimately, the righteousness *vel non* of [the plaintiff's] arguments on the merits may gain [her] little, if anything, the question presently before [the court] is one of <u>standing</u>, and thus does not implicate the merits." (footnote omitted) (emphasis added)).[11]

---

[11] Cases exist to the contrary on the standing issue. <u>See</u> <u>Helms v. Commissioner of Soc. Sec.</u>, No. 3:20CV589, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021) (unpublished) ("The [c]ourt finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected [the] ALJ[ ]'s decision or any other aspect of the administrative litigation in a material way. Because [the p]laintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality."); <u>Catherine J.S.W. v. Commissioner of Soc. Sec.</u>, No. 3:20CV5602, 2021 WL 5276522, at *8 (W.D. Wash. Nov. 12, 2021) (unpublished) ("Because [the p]laintiff has not shown any compensable harm fairly traceable to the actions of former Commissioner [Andrew] Saul, . . . the [p]laintiff's situation is distinguishable from the plaintiff's claims in <u>Collins</u>; [the p]laintiff has failed to establish standing . . . ."); <u>Amanda B. v. Commissioner, Soc. Sec. Admin.</u>, No. 3:20CV434, 2021 WL 4993944, at *9 (D. Or. Oct. 26, 2021) (unpublished) ("[The p]laintiff . . . does not allege the SSA Commissioner took any action that is in any way related to the ALJ's decision or the decision by the Appeals Council."), <u>appeal filed</u>, No. 21-36014 (9th Cir. Dec. 9, 2021); <u>Brinkman v. Kijakazi</u>, No. 2:21CV528, 2021 WL 4462897, at *2 (D. Nev. Sept. 29, 2021) (unpublished) ("Because [the p]laintiff offers nothing that traces the decision by the ALJ . . . to any alleged injurious conduct by the SSA Commissioner, [the plaintiff] has not demonstrated traceability and her constitutional violation claim fails for lack of standing."); <u>see also</u> <u>Drye v. Kijakazi</u>, No. 1:21CV135, 2022 WL 1446672, at *7 & n.1 (W.D.N.C. May 6, 2022) (unpublished) (rejecting "remand based on [separation of powers] constitutional argument" because "[the p]laintiff lacks standing" and observing that "many [courts] have repeatedly rejected Social Security plaintiffs' claims that ALJ's decisions are constitutionally defective based on a separation of powers argument" (citing cases)).

40

However, even courts among that number have expressed doubt that the plaintiffs' Collins-based claims could succeed on the merits:

> The outcome of Collins is even less auspicious for [the] plaintiff's substantive claim. The [Supreme] Court there rejected the appellant's argument that the actions of the Director of the FHFA of which appellant complained were void:
>
>> All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.
>
> Collins, 141 S. Ct. at 1787 (emphases in original). Accordingly, "the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office," including implementing the provision of which the appellant complained. Id. at 1788 n.23. It thus may well be that, even if the removal provisions of the [] Act are unconstitutional, the [SSA]'s ALJs still had authority to issue disability determinations.

Tafoya, 551 F. Supp. 3d at 1059 n.6; see also Dante v. Saul, Civ. No. 20-702, 2021 WL 2936576, at *5 (D.N.M. July 13, 2021) (unpublished) ("Th[e] rationale [in Collins] appears to undermine [the p]laintiff's position that the Commissioner acted outside his constitutional authority when he delegated authority to the ALJ to decide [the p]laintiff's disability claim. But, curiously, the [Supreme] Court's analysis in Collins also supports a finding that [the p]laintiff has standing to assert a constitutional claim under this now-questionable theory." (italics omitted, underscoring

41

added)). In sum, cases decided in the <u>standing</u> context do not provide a basis for the Court to find actual harm to Plaintiff arising from Section 902(a)(3)'s removal provision.

Simply put, Plaintiff's third assignment of error does not entitle her to relief.

### III. CONCLUSION

Plaintiff has not established errors warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 13) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 16) be granted, and that this action be dismissed with prejudice.


                         /s/ L. Patrick Auld
                       **L. Patrick Auld**
                 **United States Magistrate Judge**

June 21, 2022

42